UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
TASNEEM DOMINICK,

                    Plaintiff,

          -against-                              MEMORANDUM & ORDER
                                                 11-CV-3452(JS)(GRB)
HOSPITALITY VALUATION SERVICES, INC.,
HOTEL APPRAISALS, LLC, and DOE
CORPORATIONS 1-5,

                    Defendants.
----------------------------------------X
APPEARANCES
For Plaintiff:      Brian Adam Heller, Esq.
                    Davida S. Perry, Esq.
                    Julie Dana Tucker, Esq.
                    Matthew Thomas Schatz, Esq.
                    Schwartz & Perry LLP
                    295 Madison Ave., 26th Floor
                    New York, NY 10017

For Defendants:     Bertrand B. Pogrebin, Esq.
                    Adam Colon, Esq.
                    Littler Mendelson, P.C.
                    900 Third Avenue
                    New York, NY 10022

SEYBERT, District Judge:

          Tasneem Dominick ("Plaintiff") commenced this action on
July 18, 2011 against Hospitality Valuation Services, Inc.
("HVS"), Hotel Appraisals, LLC (together with HVS, "Defendants"),
and Doe Corporations 1-5, asserting claims for pregnancy
discrimination under the Pregnancy Discrimination Act of Title VII
("Title VII"), as amended 42 U.S.C. § 2000e et seq., and under the
New York State Human Rights Law ("NYSHRL"), N.Y. EXEC. LAW
§ 296(1)(a).  Pending before the Court is Defendants' motion for

summary judgment.  For the following reasons, Defendants' motion is DENIED.

BACKGROUND

Before discussing the record in this case, the Court must make two preliminary points.  <u>First</u>, in Plaintiff's 56.1 Counterstatement, she repeatedly asserts that facts, supported by Defendants with admissible evidence in the form of deposition testimony, are in dispute because she questions the credibility of the deponents.  However, although a witness's credibility is typically a question of fact for the jury, <u>see, e.g.</u>, <u>Dillon v. Morano</u>, 497 F.3d 247, 254 (2d Cir. 2007), "[b]road, conclusory attacks on the credibility of a witness will not, by themselves, present questions of material fact" precluding summary judgment, <u>Island Software & Comp. Serv., Inc. v. Microsoft Corp.</u>, 413 F.3d 257, 261 (2d Cir. 2005); <u>see also</u> <u>Crawford-El v. Britton</u>, 523 U.S. 574, 600, 118 S. Ct. 1584, 140 L. Ed. 2d 759 (1998) (stating that a plaintiff "may not respond [to a motion for summary judgment] simply with general attacks upon the defendant's credibility"); <u>McCollough v. Wyandanch Union Free Sch. Dist.</u>, 187 F.3d 272, 280 (2d Cir. 1999) (stating that a party "cannot defeat summary judgment . . . merely by impugning [a witness]'s honesty").  Rather, the non-moving party must "identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive."  <u>Crawford-El</u>, 523

2

U.S. at 600.  Thus, to the extent that Plaintiff disputes facts in Defendants' 56.1 Statement on the grounds of credibility without any admissible evidence in support, the Court will deem those facts admitted.  See E.D.N.Y. Local Civ. R. 56.1(c).  Second, both Plaintiff and Defendants submitted affidavits of parties and witnesses who were deposed during the course of discovery.  A party, however, "may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony."  Trans-Orient Marine Corp. v. Star Trading & Marine, Inc., 925 F.2d 566, 572 (2d Cir. 1991); see also Berrios v. Nicholas Zito Racing Stable, Inc., 849 F. Supp. 2d 372, 378 (E.D.N.Y. 2012).  Thus, to the extent that these affidavits contradict the affiants' deposition testimony, they will not be considered by the Court.  With these principles in mind, the Court reviews the evidence before it.

The following facts are drawn from the parties' Local Civil Rule 56.1 Statements ("Defs. 56.1 Stmt." and "Pl. 56.1 Counterstmt.") and their evidence in support, and any factual disputes will be noted.

I.  The Parties

A.  Defendants

Defendant HVS is a retained search firm in the hospitality industry that performs executive and senior level searches for its clients.  (Kefgen Decl. ¶ 2; Defs. 56.1 Stmt.

3

¶ 10.) HVS is a subsidiary of Defendant Hotel Appraisals, LLC. (Kefgen Decl. ¶ 1.) At all relevant times, HVS had three partners --the CEO, Keith Kevgen, and the two co-presidents/managing directors, David Mansbach and Doug Rosen (Defs. 56.1 Stmt. ¶ 6; Kefgen Dep. 8, 12; Mansbach Dep. 10-11; Rosen Dep. 8)--and anywhere between two and four vice-presidents (Kefgen Dep. 63).

When retained by a client to conduct a search, HVS will enter into an exclusive search agreement, pursuant to which HVS is the only search firm working to fill the position for which it is retained. (Defs. 56.1 Stmt. ¶ 11.) HVS's recruitment process usually proceeds as follows: <u>First</u>, HVS has a "kickoff" meeting or call with the client to discuss the parameters of the search, including the title and description of the position it is looking to fill, the qualifications of an ideal candidate, and compensation. (Kefgen Dep. 67-68; Defs. 56.1 Stmt. ¶¶ 13-14.) Typically, the partner who brought in the business and a vice-president are on this call. (Kefgen Dep. 67.) <u>Second</u>, the vice-president is then responsible for creating a profile or matrix for the search and compiling a peer group--<u>i.e.</u>, target organizations for the search. (Kefgen Dep. 69-70; Pl. Dep. 64-66.) <u>Third</u>, the vice-president identifies and contacts anywhere from 150 to 250 qualified candidates in the hopes of finding 25 or more interested candidates. (Kefgen Dep. 71; Pl. Dep. 65; Defs. 56.1 Stmt. ¶ 15.) During the recruitment process, vice-presidents are responsible

for discussing the candidates' current compensation and their compensation expectations. (Defs. 56.1 Stmt. ¶¶ 16-17; Pl. Dep. 65-67.) <u>Then</u>, HVS conducts screening interviews and ultimately presents five to seven candidates to the client. (Kefgen Dep. 71; Pl. Dep. 67-68.) If the client is interested in any of the candidates, HVS will assist with checking references and handling any negotiations between the client and the candidate. (Defs. 56.1 Stmt. ¶ 12.) If the client is not interested in any of the candidates, HVS must continue its search. The level of a partner's involvement in the search after the kickoff meeting varies. (Pl. 56.1 Counterstmt. ¶ 5.)

    B.   <u>Plaintiff</u>

HVS hired Plaintiff as a vice-president on May 20, 2009. (Defs. 56.1 Stmt. ¶ 8.)[1] At the time, Plaintiff had approximately six years of recruiting experience. (Defs. 56.1 Stmt. ¶ 1.)

II.  <u>Plaintiff's Employment with HVS</u>

Plaintiff's employment with HVS commenced on June 15, 2009. (Defs. 56.1 Stmt. ¶ 9.) Plaintiff asserts that, prior to starting, Mr. Rosen had asked her if she had any children, stating that children would "cause a distraction." (Pl. Aff. ¶ 15.) Mr. Rosen denies making that statement. (Rosen Dep. 28.)

---

[1] Plaintiff did not accept HVS's initial offer and requested a higher base salary. HVS subsequently increased its offer, and Plaintiff accepted. (Defs. 56.1 Stmt. ¶ 8.)

A.   Plaintiff's Assignments

During her employment with HVS, Plaintiff was assigned nine separate searches. (Defs. 56.1 Stmt. ¶ 29.) Plaintiff worked with Mr. Mansbach on a search for BR Guest for a new vice president of human relations. (Defs. 56.1 Stmt. ¶ 30; Mansbach Dep. 60.) Although HVS ultimately placed a candidate that had been found and vetted by Plaintiff, it was Mr. Mansbach who presented the candidate to the client and ultimately finalized the terms of the placement.[2] (Defs. 56.1 Stmt. ¶ 31; Pl. Dep. 76-77.) After the placement, Plaintiff asked for feedback and was told by Mr. Mansbach that she did a "[g]ood job. Great." (Pl. Dep. 72.) Plaintiff also worked with Mr. Mansbach on a mid-management search for Bottega Louie. (Defs. 56.1 Stmt. ¶ 32.) Plaintiff did not secure a placement for this search (Defs. 56.1 Stmt. ¶ 32); however, it was assigned to her just three weeks before her termination (Pl. Dep. 79).

Plaintiff worked with Mr. Rosen and another vice-president, Juliette Boone, on a search for White Lodging. (Defs. 56.1 Stmt. ¶ 33.) According to Plaintiff, during the course of the search, she asked Mr. Rosen whether there was anything that

---

[2] HVS's contact at BR Guest was Steve Weissman--an individual that Mr. Mansbach himself placed at BR Guest. (Mansbach Dep. 61-62.) According to Plaintiff, Mr. Mansbach was the primary contact for the client due to this relationship. (Pl. Dep. 74-75.)

she could/should be doing differently, and Mr. Rosen replied: "No, you're doing a great job, you're working hard. Thank you." (Pl. Dep. 73.) Mr. Rosen testified, however, that he told her to stay motivated, keep her call volume up, and stay engaged. (Rosen Dep. 115-116.) The candidate ultimately placed at White Lodging was found by Ms. Boone, and all communications with the client were through Mr. Rosen. (Defs. 56.1 Stmt. ¶¶ 33-34.) After the placement was complete, on or around October 30, 2009, Mr. Rosen sent an email to both Plaintiff and Ms. Boone stating: "Great Job, Tas and Juliette." (Defs. Ex. J.) Mr. Rosen testified, however, that he did not believe that Plaintiff did a "great job" and that he said it merely to provide encouragement. (Defs. 56.1 Stmt. ¶ 35; Rosen Dep. 121-123.) Plaintiff worked with Mr. Rosen again on a search for API. Plaintiff found the candidate that was ultimately placed, and Mr. Rosen presented the candidate to the client and finalized the placement. (Defs. 56.1 Stmt. ¶ 36; Pl. Dep. 87-88.) After the placement, Mr. Rosen sent Plaintiff an email stating: "And great job tas [sic]." (Defs. 56.1 Stmt. ¶ 37; Defs. Ex. K.) Even though he congratulated her, Mr. Rosen testified that this may not have been reflective of her abilities but was intended to provide encouragement. (Defs. 56.1 Stmt. ¶ 37; Rosen Dep. 137-38.) Plaintiff also worked with Mr. Rosen on searches for Langham Hotels and Bristol Panama of Buenaventura (Defs. 56.1 Stmt. ¶¶ 38-39) but was terminated before the searches

were completed (Pl. 56.1 Counterstmt. ¶¶ 38-39). With respect to Langham Hotels, the candidate that was ultimately placed was identified by Plaintiff (Pl. 56.1 Counterstmt. ¶ 38; Rosen Dep. 148), and with respect to Bristol Panama, the client ultimately cancelled the search for reasons unrelated to HVS (Pl. Counterstmt. ¶ 39; Rosen Dep. 158).

Plaintiff worked with Mr. Kefgen on two searches during her tenure at HVS. The first was for Lowell Hotel, a longstanding client of HVS. (Defs. 56.1 Stmt. ¶¶ 40-41.) When Plaintiff was assigned to Lowell, the search was already underway and had been pending for a significant period of time.[3] (Pl. Dep. 85.) While screening candidates for the position, Plaintiff found out that Lowell breached its exclusivity agreement and hired another firm to work on the same search. (Def. 56.1 Stmt. ¶ 43; Pl. Dep. 85.) After Plaintiff relayed this information to Mr. Kefgen, he reached out to Lowell to find out why they hired another search firm in breach of their agreement. (Kefgen Dep. 81.) Mr. Kefgen testified that his contact at Lowell responded, stating: "I have to get this job filled and I can't wait around for Tas." (Kefgen Def.

---

[3] Plaintiff testified that, even though it was Mr. Kefgen's client, she was told by Mr. Mansbach that the search should be a low priority. (Pl. Dep. 82, 85.) Nonetheless, she stated that she treated it as a high priority, testifying that "all the searches were high priority" to her. (Pl. Dep. 86.)

81.)[4]  Thus, no one from HVS completed this search for Lowell. (Defs. 56.1 Stmt. ¶ 46; Kefgen Dep. 85.)

Plaintiff also worked with Mr. Kefgen on a search to fill a vice president of finance position for another of HVS's longstanding clients, Viceroy, in its California office. (Defs. 56.1 Stmt. ¶ 48.)  Viceroy informed Mr. Kefgen of the parameters of the search--including what they were looking for in a candidate and the position's base salary ($175,000)--and Mr. Kefgen relayed that information to Plaintiff.  (Pl. Dep. 116; Defs. 56.1 Stmt. ¶ 48.)  At some point during the search, Plaintiff identified Steve Sowards as a candidate for the position.  (Defs. 56.1 Stmt. ¶ 49; Pl. Dep. 117.)  Mr. Sowards was then working for the Marriot Hotel Group in Florida and was making approximately $140,000 per year, plus an annual bonus and stock options.  (Defs. Ex. L.)  Plaintiff testified that one of the first things she discussed with Mr. Sowards was his compensation expectations; she disclosed to him that Viceroy was willing to pay between $175,000 and $190,000, and

---

[4] Plaintiff objects to the use of this testimony on the grounds that it is hearsay.  To the extent that Defendants rely on this statement for the truth of the matter asserted--i.e., that Plaintiff was taking too long to fill the position--Plaintiff is correct.  See FED. R. EVID. 801(c).  However, Defendants may rely upon this statement to demonstrate that Kefgen received a complaint about Plaintiff--i.e., to establish his state of mind in deciding whether to discharge Plaintiff.  See, e.g., Wolf v. Time Warner, Inc., No. 09-CV-6549, 2012 WL 4336232, at *7 (S.D.N.Y. Sept. 17, 2012); Woodard v. TWC Media Solutions, Inc., No 09-CV-3000, 2011 WL 70386, at *6 (S.D.N.Y. Jan. 4, 2011).

he stated that "that was reasonable with what he was looking for." (Pl. Dep. 120-21.) She ultimately decided to present him along with a few other candidates to Viceroy for consideration.

Plaintiff's main contact at Viceroy was Mary Pierson, Viceroy's CFO. (Defs. 56.1 Stmt. ¶ 50.) On or around October 22, 2009, Ms. Pierson emailed Plaintiff, asking for Mr. Sowards' and the other candidates' current salaries and compensation expectations. (Defs. 56.1 Stmt. ¶ 51; Defs. Ex. L.) Plaintiff responded via email the same day, detailing the candidates' current compensation only. (Defs. Ex. L.) She testified, however, that she followed up her email with a phone call to Ms. Pierson where she stated that, although the $175,000 was a considerable raise for some of the candidates, Mr. Sowards would need to relocate from Florida and would likely require more money. (Pl. Dep. 123; Pl. 56.1 Counterstmt. ¶ 51.)[5] Viceroy thereafter increased its base salary offer to $190,000. (Pl. Dep. 124-25.)

On or around November 11, 2009, Ms. Pierson emailed Plaintiff asking what it would take to induce candidates like Mr. Sowards to change companies. (Defs. Ex. M.) She specifically asked whether a signing bonus would be required if a candidate accepted the position prior to bonus season. (Defs. Ex. M.) Plaintiff responded via email, answering her question about

---

[5] Whether Plaintiff relayed this conversation to Mr. Kefgen is in dispute. (Pl. Dep. 128; Kefgen Dep. 110.)

bonuses. (Defs. Ex. M.) She did not provide any additional information about base salary via email, but she did follow up via telephone, asking if Ms. Pierson needed any additional information. (Pl. Dep. 132.)

Viceroy interviewed Mr. Sowards twice at its expense: once in Florida in December 2009 and once in California in January 2010. (Pl. Exs. R, S.) After the January interview, Ms. Pierson asked Mr. Sowards directly about his "compensation needs"-- including annual salary, bonus, and relocation expenses. (Defs. Ex. N.) She encouraged him to discuss this with Plaintiff. (Defs. Ex. N.) Approximately a week later, on or around January 25, 2010, Mr. Sowards sent Plaintiff his compensation expectations: He was seeking $315,000 as a base salary, plus a $75,000 signing bonus, a $2,500 housing allowance, and a year-end bonus. (Pl. Dep. 145.) Plaintiff testified that had she known that these were his expectations, she would have never identified him as a potential candidate for Viceroy. (Pl. Dep. 146-47.) Plaintiff emailed Mr. Sowards, confirming her receipt of his compensation expectations and telling him that nothing would be forwarded to Viceroy until HVS had an opportunity to review it with him. (Def. Ex. O.) She also forwarded Mr. Sowards' email to Mr. Kefgen. (Defs. Ex. P.) Mr. Kefgen responded stating that Mr. Sowards' compensation expectations "look[ed] very rich. Probably more than [Ms.

Pierson]'s making." (Defs. Ex. Q.) He asked her to set up a meeting with Mr. Sowards. (Defs. Ex. Q.)

Thereafter, on February 1, 2010, Mr. Sowards, Mr. Kefgen, and Plaintiff participated in a conference call where Mr. Kefgen told Mr. Sowards to temper his compensation expectations, which were not in line with what Viceroy was willing to pay. (Defs. 56.1 Stmt. ¶ 67; Pl. 56.1 Stmt. ¶ 67.) After the call, Mr. Sowards submitted his compensation expectations to Ms. Pierson directly; however, he reduced his base salary expectation to $275,000. (Defs. 56.1 Stmt. ¶¶ 68-69.)

Upon receipt of Mr. Sowards' expectations, Ms. Pierson emailed Plaintiff, carbon copying Mr. Kefgen, stating: "Tas--I left you a voicemail yesterday. Steve sent me what he is looking for in a comp package. It is completely out of line with what we are paying. Please advise asap whether there is any point in pursuing this further." (Defs. Ex. S.) Mr. Kefgen responded via email that same day, stating:

> We had an in-depth conversation with Steve yesterday regarding compensation. After receiving his spreadsheet, we suggested he temper some of his requirements based on the initial range we quoted. The real issue is cost of housing and relocation. It potentially changes the impact on all components of compensation. That is the hurdle that needs to be jumped. By most calculations, his package in Florida would cost double in Southern California. This should have probably been dealt with earlier on in the search process but it is the reality

12

of the marketplace.  I am happy to discuss
next steps if any.

(Defs. Ex. T.)  Plaintiff forwarded this email to Ms. Boone,

stating: "FYI--just wanted to let you know what is going on......I

don't know how I would get through this blunder without Keith."

(Defs. Ex. U.)

Ms. Pierson then responded via email, stating:

As you and Tas have been aware of the target
compensation range since the outset of the
assignment, I am really disappointed that HVS
did not convey Steve's expectations to us
sooner.  It is quite possible we have put forth
a lot of energy and effort for nought.

(Defs. Ex. V.)  Ms. Pierson also stated, however, that she was

"working on the best and final offer [Viceroy] can propose to

Steve."  (Defs. Ex. V.)  She added that she believed that a quick

resolution would be "for the good of both parties."  (Defs. Ex.

V.)  Mr. Kefgen responded via email, stating that he "underst[ood]

that managing expectation on both sides is one of [HVS's]

responsibilities," and he also "agree[d] that coming to a speedy

conclusion [wa]s important."  (Defs. Ex. V.)  Plaintiff forwarded

this email chain to another vice-president, Andrew Hazelton, who

was not involved in the Viceroy search.  (Defs. Ex. W.)

On February 4, 2010, Ms. Pierson called Mr. Kefgen to

tell him that she was disappointed in Plaintiff and HVS, that she

may never work with HVS again, and that Viceroy would be taking

over the negotiations with Sowards directly.  (Defs. 56.1 Stmt.

¶ 78 (citing Kefgen Dep. 131, 152; Kefgen Decl. ¶ 38).)[6]  Viceroy

ultimately hired Sowards, offering him $245,000 as a base salary

plus a bonus.  (Kefgen Dep. 131-32.)  HVS has worked with Viceroy

a few times thereafter.  (Kefgen Dep. 152.)

B.  Plaintiff's Pregnancy

In the interim, on or around December 2, 2009, Plaintiff

notified Mr. Kefgen that she was pregnant with her first child.

(Defs. 56.1 Stmt. ¶ 97.)  She advised him that she intended to

work throughout her pregnancy and return after the baby was born.

(Defs. 56.1 Stmt. ¶ 97.)  Mr. Kefgen responded that he would notify

the other partners.  (Defs. 56.1 Stmt. ¶ 98.)  He did not

congratulate her.  (Pl. Dep. 210.)  When Mr. Kefgen informed Mr.

Mansbach that Plaintiff was pregnant, he replied that that was

fantastic.  (Defs. 56.1 Stmt. ¶ 99.)  That same day, Mr. Mansbach

called Plaintiff and asked "[w]hy didn't you come and tell me

first?"  (Pl. Dep. 242.)  He also told her not to worry, that

"we'll pick up the slack" (Pl. Dep. 242), to which Plaintiff

replied: "I'm capable of doing my job" (Pl. Dep. 243).  That was

the only conversation Plaintiff had with Mr. Mansbach about her

---

[6] Plaintiff again objects to the admissibility of this evidence
on the grounds of hearsay.  (Pls. 56.1 Counterstmt. ¶ 78.)  To
the extent that Defendants are relying on this statement for the
truth of the matter asserted--i.e., that Ms. Pierson was
actually disappointed in Plaintiff and HVS--it is inadmissible
hearsay.  See supra note 4.  However, to the extent that it is
being offered to show that Mr. Kefgen received a complaint, it
is not hearsay.  See supra note 4.

pregnancy. (Pl. Dep. 246.) Mr. Rosen also called that day to congratulate her. (Pl. Dep. 235.)

Thereafter, on Friday, December 4, 2009, after Plaintiff called out sick, Mr. Mansbach sent Mr. Kefgen an email stating that it "looks like it is going to be a rough pregnancy." (Defs. Ex. X.)[7] Plaintiff called in sick again the following week. (Pl. Dep. 211.) On Tuesday, December 8, 2009, Mr. Rosen emailed her and asked: "Are you ill or can you talk Bonaventura?"--to which Plaintiff replied that she was too ill to talk. (Pl. Dep. 235-36.) Then, on December 11, 2009, when Plaintiff called Mr. Kefgen to explain that she was suffering from severe morning sickness and could not come into work, Mr. Kefgen responded: "I've been through this before, I have a business to run. You've used up your sick time, when are you coming back to work?" (Pl. Dep. 213.) Plaintiff returned to work the following Monday. HVS did not deduct any pay for Plaintiff's sick days and thereafter approved a ten-day vacation request for the end of December. (Defs. 56.1 Stmt. ¶¶ 107-110.)

There is no evidence in the record that Plaintiff's pregnancy came up with the partners again until February 3, 2010 --the day before Viceroy allegedly complained about Plaintiff and

---

[7] When asked at his deposition whether he meant rough for Plaintiff or rough for HVS, Mr. Mansbach replied that he did not know. (Mansbach Dep. 119-120.)

took over the negotiations with Mr. Sowards. On that date, Plaintiff approached Mr. Kefgen and asked about HVS's maternity leave policy. (Defs. 56.1 Stmt. ¶ 123.) He replied that he did not know. (Defs. 56.1 Stmt. ¶ 123.)

C.   Plaintiff's Evaluation & Termination

On February 4, 2010, after Mr. Kefgen spoke to Ms. Pierson, he met with Mr. Mansbach and Mr. Rosen to discuss Plaintiff's performance. (Defs. 56.1 Stmt. ¶¶ 79-80.)[8] At the meeting, Mr. Kefgen relayed what had happened with Viceroy, and the three agreed to terminate her employment. (Defs. 56.1 Stmt. ¶ 80.) They all testified that her work had been below HVS's standards. (Defs. 56.1 Stmt. ¶ 80.)[9]

Mr. Rosen called Plaintiff that afternoon to tell her that she was being terminated due to the quality of her work. (Defs. 56.1 Stmt. ¶ 85.) He noted during the conversation that he was surprised that Plaintiff did not see it coming, to which Plaintiff replied that she had not received any negative feedback from any of the partners. (Pl. Dep. 195.) Plaintiff asked if her termination had anything to do with her pregnancy, and Mr. Rosen

---

[8] Plaintiff disputes that the meeting occurred because the three partners have conflicting stories about where it occurred--in the hallway, in Mr. Kefgen's office, out to lunch. (Pl. 56.1 Counterstmt. ¶ 79.)

[9] Plaintiff disputes that her work was below HVS's standards. (Pl. 56.1 Counterstmt. ¶ 80.)

responded, "don't even go there." (Rosen Dep. 187-88.) He, nevertheless, asked that she consider staying on for an additional month to "close the loop with candidates." (Pl. Dep. 196.)

Shortly thereafter, Mr. Mansbach called Plaintiff "as a courtesy." (Pl. Dep. 197.) Plaintiff testified that Mr. Mansbach conceded that he never had any issues with Plaintiff's work (Pl. Dep. 197) but also contradicted himself, stating that she had been producing "D-level" work (Pl. Dep. 198). According to Plaintiff, Mr. Mansbach also told her that HVS was changing its model--looking for partners, not recruiters--so there was no longer a place for her. (Pl. Dep. 198.)

Later that day, Mr. Kefgen called Plaintiff. (Defs. 56.1 Stmt. ¶ 89.) He told her that he was disappointed with her performance at HVS, that there were issues with each of her searches, and that he had never, in his twenty-five years in the business, received a call from a client that was unhappy with the recruiter with whom he or she was working. (Pl. Dep. 200-01.) Plaintiff defended her work, with Viceroy and in general, and Mr. Kefgen responded, telling her that she "see[s] things so far from reality that [she's] delusional." (Defs. 56.1 Stmt. ¶ 92.) Plaintiff left HVS after getting off the phone with Kefgen. (Defs. 56.1 Stmt. ¶ 96.)

In March 2010, after Plaintiff left HVS, she received the results of her annual performance evaluation, which had been

conducted prior to her termination. (Defs. Ex. H.) The evaluation reflects the views of Plaintiff, her peers, and HVS's partners regarding her performance and the quality of her work. Plaintiff consistently evaluated her performance more positively than her peers and HVS's partners. (Defs. Ex. H at HVS0014271.) She scored "relatively low" in the categories of personal effectiveness and quality and customer focus and "moderately high" in the categories of analysis and writing skills, coaching/training, communication, teamwork, and relationship building. (Defs. Ex. H.) She also received the following anonymous feedback:

> "Tas needs better time management skills. I would like to see her toughen up a bit."

> "Solid analytical skills, would like her to take a stronger stand on things."

> "Tas has to improve communication skills. She has made an effort in this regard but still an area of improvement."

> "I think Tas was overwhelmed at first. She has been adjusting to our pace and workload. She has the potential to be a great team member with more maturity and training."

> "Tas is very thoughtful and makes a real effort. She will learn to be more independent and a leader as she gets more experience."

(Defs. Ex. H at HVS0014306.)

III. <u>Procedural History</u>

Plaintiff commenced this action on July 18, 2011 against HVS and Hotel Appraisals, LLC asserting claims under Title VII and

the NYSHRL for pregnancy discrimination.  (Docket Entry 1.)  On November 19, 2012, Defendants moved for summary judgment.  (Docket Entry 23.)  That motion is presently before the Court.

## DISCUSSION

### I.    Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  "In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997).

"The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment."  Id.; see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970).  A genuine factual issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  To defeat summary judgment, "the non-movant must 'set forth

specific facts showing that there is a genuine issue for trial.'" _Weinstock v. Columbia Univ._, 224 F.3d 33, 41 (2d Cir. 2000) (quoting _Anderson_, 477 U.S. at 256). "[M]ere speculation or conjecture as to the true nature of the facts" will not overcome a motion for summary judgment. _Knight v. U.S. Fire Ins. Co._, 804 F.2d 9, 12 (2d Cir. 1986); _see also Williams v. Smith_, 781 F.2d 319, 323 (2d Cir. 1986) ("Mere conclusory allegations or denials will not suffice." (citation omitted)); _Weinstock_, 224 F.3d at 41 ("[U]nsupported allegations do not create a material issue of fact.").

In deciding a motion for summary judgment in a discrimination case, the court must "carefully scrutinize[]" an employer's papers, affidavits and depositions for "circumstantial proof which, if believed, would show discrimination." _Gallo v. Prudential Residential Servs., L.P._, 22 F.3d 1219, 1224 (2d Cir. 1994). Thus, a court should not grant an employer's motion for summary judgment unless "the evidence of discriminatory intent is so slight that no rational jury could find in plaintiff's favor." _Viola v. Philips Medical Sys. of N. Am._, 42 F.3d 712, 716 (2d Cir. 1994). Nevertheless, although the Court must closely examine an employer's evidence, summary judgment remains available in all discrimination cases. _See Weinstock_, 224 F.3d at 41-42 ("The 'impression that summary judgment is unavailable to defendants in

discrimination cases is unsupportable.'" (quoting <u>McLee</u>, 38 F.3d at 68)).

## II. <u>Defendants' Motion</u>

Because there is no direct evidence of discrimination, Plaintiff's claims that she was wrongfully fired because of her pregnancy are governed by the familiar burden-shifting framework established by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802–04, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). <u>See</u>, <u>e.g.</u>, <u>DeMarco v. CooperVision, Inc.</u>, 369 F. App'x 254, 255 (2d Cir. 2010) (noting that <u>McDonnell Douglas</u> governs pregnancy discrimination claims under both Title VII and the NYSHRL). Pursuant to <u>McDonnell Douglas</u>, Plaintiff bears the initial burden of establishing a prima facie case of discrimination. <u>See Kerzer v. Kingly Mfg.</u>, 156 F.3d 396, 401 (2d Cir. 1998). If she satisfies this requirement, the burden shifts to Defendants to articulate a legitimate, nondiscriminatory reason for their action. <u>Id.</u> Then, the burden shifts back to Plaintiff to offer evidence that Defendants' stated reason was merely a pretext for unlawful discrimination. <u>Id.</u>

For the purpose of this motion, Defendants have conceded that Plaintiff has established a prima facie case of pregnancy discrimination. Thus, "the burden is on the defendant[s] to produce evidence 'which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.'"

<u>Kerzer</u>, 156 F.3d at 402 (quoting <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 509, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)). Defendants have done so here: an employee's poor performance is a legitimate, nondiscriminatory reason to discharge that employee. <u>Lambert v. McCann Erickson</u>, 543 F. Supp. 2d 265, 279 (S.D.N.Y. 2008).

At this point, the burden then shifts back to Plaintiff, who must offer evidence sufficient to convince a reasonable jury that Defendants' stated reason was merely a pretext for unlawful discrimination. <u>Kerzer</u>, 156 F.3d at 401. "An employer's reason for termination cannot be proved to be a pretext for discrimination 'unless it is shown both that the reason was false, <u>and</u> that discrimination was the real reason.'" <u>Id.</u> (emphasis added) (quoting <u>Hicks</u>, 509 U.S. at 515). "In the summary judgment context, this means 'that the plaintiff must establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for discharging her is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision.'" <u>Id.</u> (quoting <u>Gallo v. Prudential Residential Servs., Ltd. P'ship</u>, 22 F.3d 1219, 1225 (2d Cir. 1994)).

A.  Whether HVS's Stated Reason Was False

The Court finds that there is a question of fact regarding whether Plaintiff was terminated due to poor performance.  First, even though Mr. Kefgen told Plaintiff that there were issues with every single search to which she was assigned (Pl. Dep. 200), there is evidence in the record that Mr. Mansbach told her that he never had any issues with her work (Pl. Dep. 198), and Mr. Rosen asked Plaintiff to consider staying for an additional month to transition her searches (Pl. Dep. 196). Further, there is evidence that Plaintiff had previously repeatedly asked for feedback and was always told that she was doing a good job. (Pl. Dep. 72-73; Defs. Exs. J, K.)  And although her annual evaluation indicated that she performed low in certain categories, it also reflected that she had "[s]olid analytical skills" and had "the potential to be a great team member." (Defs. Ex. H.)  Thus, there is a question of fact regarding whether Plaintiff's performance overall fell below HVS's standards.

Second, with respect to Viceroy, although Ms. Pierson may have complained to Mr. Kefgen about Plaintiff's performance-- specifically, that Plaintiff failed to advise her of Mr. Sowards compensation expectations (Kefgen Dep. 131, 152; Kefgen Decl. ¶ 38)--her complaint may not have been justified.  Plaintiff testified that she did communicate such information to Ms. Pierson (which resulted in Viceroy slightly increasing its base salary

offer) (Pl. Dep. 123) and that Mr. Sowards changed his compensation expectations late in the search process without first discussing them with Plaintiff (Pl. 146-47). Although receiving complaints from clients is a legitimate, non-discriminatory reason to discharge an employee, see Holt v. KMI-Cont'l, Inc., 95 F.3d 123, 130 (2d Cir. 1996), Plaintiff was told that she was being terminated because of poor performance--not necessarily because of client complaints. Further, Plaintiff testified that Mr. Mansbach also told her she was being let go because HVS was changing its business model.

Thus, the Court finds that there is a question of fact regarding whether Plaintiff's performance while at HVS was the cause of her termination.

B.     Whether Defendants Were Motivated by Discrimination

"However, merely concluding that questions of fact exist over the proffered reasons for plaintiff's termination is not enough to defeat defendants' motion." Boayke-Yiadom v. Laria, No. 09-CV-0622, 2012 WL 5866186, at *7 (E.D.N.Y. Nov. 19, 2012) (citing Schnabel v. Abramson, 232 F.3d 83, 88 (2d Cir. 2000)). Plaintiff must still establish that "the asserted pretextual reasons were intended to mask . . . discrimination." Schnabel, 232 F.3d at 88. Plaintiff argues that the various comments made by Kefgen, Mansbach, and Rosen plus the close temporal proximity between her asking about maternity leave and her discharge establish pretext.

Defendants disagree and assert that any inference of discriminatory animus is refuted by the fact that HVS has had employees take maternity leave in the past without repercussions. Although a very close call, the Court finds that there is a question of fact regarding whether Plaintiff's pregnancy motivated her discharge.

With respect to the pregnancy-related comments, <u>see</u> <u>supra</u> pp. 14-15, whether a comment constitutes evidence of discriminatory intent depends on whether the plaintiff has "demonstrat[ed] that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff," <u>Schreiber v. Worldco, L.L.C.</u>, 324 F. Supp. 2d 512, 518 (S.D.N.Y. 2008), or the comment is just a stray remark, <u>see</u> <u>Danzer v. Norden Sys.</u>, 151 F.3d 50, 56 (2d Cir. 1998) ("[S]tray remarks, even if made by a decision maker, do not constitute sufficient evidence to make out a case of employment discrimination."). In determining whether a comment is probative of discriminatory intent or is merely a stray remark, a court should consider:

> (1) who made the remark, <u>i.e.</u>, a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, <u>i.e.</u>, whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, <u>i.e.</u>, whether it was related to the decisionmaking process.

<u>Schreiber</u>, 324 F. Supp. 2d at 519.  Here, all of the remarks at issue were made by decisionmakers--Mr. Kefgen, Mr. Rosen, and Mr. Mansbach--and all were made in close proximity to her termination; none, however, were made in the context of her actual termination. Thus, the real issue is whether a reasonable juror could view the remarks as discriminatory.

Defendants argue that the alleged comments--namely, Mr. Mansbach's chastising Plaintiff for not telling him about her pregnancy and stating that others would "pick up the slack," Mr. Kefgen's statement that it looked like it was going to be a "rough pregnancy," Mr. Kefgen's comment regarding having "been through this before," and Mr. Rosen's comment about children being a "distraction"[10]--are innocuous and facially neutral.  The Court disagrees.  Although "[c]onsidered individually, certain of the complained of comments . . . arguably would be stray remarks[,] . . . . [v]iewed collectively . . . a reasonable jury could conclude that the remarks reflected a discriminatory atmosphere and, consequently, constituted evidence of discrimination . . . ." <u>Schreiber</u>, 324 F. Supp. 2d at 522.

---

[10] The Court does not find Mr. Rosen's asking Plaintiff if she was "too ill to talk" about a search to be at all probative of discriminatory intent, and neither does Plaintiff, as she does not mention it in her opposition brief at all.

Further, while the close temporal proximity between Plaintiff's asking about maternity leave and her termination on its own is insufficient to demonstrate pretext, see El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010), the Court may consider it in conjunction with other evidence of pretext, which, as stated above, exists here.

Finally, that Defendants may have accommodated other pregnant employees, although probative, is not dispositive and does not warrant the grant of summary judgment in their favor. The Second Circuit has stated that "[s]ince Title VII's principle focus is on protecting individuals, rather than a protected class as a whole, an employer may not escape liability for discriminating against a given employee on the basis of race simply because it can prove it treated other members of the employee's group favorably." Graham v. Long Island R.R., 230 F.3d 34, 43 (2d Cir. 2000).

Accordingly, as the Court finds that there is a question of fact regarding Defendants' motivations for terminating Plaintiff's employment, their motion for summary judgment is DENIED.

## III. Doe Corporations 1-5

No one has mentioned the Doe Corporations. Nonetheless, as discovery has closed and Plaintiff has yet to identify or serve these unknown defendants, the Court sua sponte DISMISSES

Plaintiff's claims against them WITHOUT PREJUDICE. See, e.g., Blake v. Race, 487 F. Supp. 2d 187, 192 n.1 (E.D.N.Y. 2007) (sua sponte dismissing claims against John Doe defendants because plaintiff "failed to identify any of the unnamed defendants, or to present any evidence demonstrating their involvement in the infringing activity," prior to the close of discovery); De La Rosa v. N.Y.C. 33 Precinct, No. 07-CV-7577, 2010 WL 4965482, at *6 (S.D.N.Y. Nov. 23, 2010) (sua sponte dismissing claims against John Doe defendants for failure to timely serve process); Delrosario v. City of N.Y., No. 07-CV-2027, 2010 WL 882990, at *5 (S.D.N.Y. Mar. 4, 2010) (sua sponte dismissing claims against John Doe defendants for failure to prosecute "[w]here discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants").

## CONCLUSION

For the foregoing reasons, Defendants' motion is DENIED, and the Court sua sponte DISMISSES the claims against Doe Corporations 1-5. This matter is hereby REFERRED to Magistrate Judge Gary R. Brown to resolve any remaining pre-trial issues and to determine whether the case is ready for trial.

SO ORDERED.

/s/ JOANNA SEYBERT_____
Joanna Seybert, U.S.D.J.

Dated:    September 30, 2013
          Central Islip, NY